# UNITED STATES DISTRICT COURT

### EASTERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| SENG YANG, | ) | 1:08cv00084 GSA |
| | ) | |
| | ) | |
| | ) | ORDER REGARDING PLAINTIFF'S |
| Plaintiff, | ) | SOCIAL SECURITY COMPLAINT |
| | ) | |
| v. | ) | |
| | ) | |
| MICHAEL J. ASTRUE, Commissioner | ) | |
| of Social Security, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## BACKGROUND

Plaintiff Seng Yang ("Plaintiff") seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner" or "Defendant") denying his application for supplemental security income pursuant to Title XVI of the Social Security Act. The matter is currently before the Court on the parties' briefs, which were submitted, without oral argument, to the Honorable Gary S. Austin, United States Magistrate Judge.[1]

---

[1] The parties consented to the jurisdiction of the United States Magistrate Judge. On October 29, 2008, the action was reassigned to the Honorable Gary S. Austin for all purposes.

1

# FACTS AND PRIOR PROCEEDINGS[2]

Plaintiff filed his application on or about August 20, 2002,[3] alleging disability since January 1, 1993,[4] due to an ulcer and "pain." AR 116-118.  His application was denied initially and on reconsideration, and Plaintiff requested a hearing before an Administrative Law Judge ("ALJ").  AR 90-94.  ALJ Frederick J. Graf held a hearing on April 14, 2004, and issued an order denying benefits on June 3, 2004.  AR 71-76.  On July 13, 2005, the Appeals Council vacated the decision and remanded for further proceedings because the recording from the hearing was lost and therefore the record was incomplete.  AR 78-79.  Thereafter, on May 16, 2006,[5] ALJ James Berry held a hearing in Fresno, California.  Plaintiff appeared and testified with the assistance of an interpreter and was represented by counsel.  AR 415-436.  On September 1, 2006, ALJ Berry issued an order denying benefits.  AR 19-26.  On November 13, 2007, the Appeals Council denied review.  AR 7-9.

## 2006 Hearing Testimony

ALJ Berry held a hearing on May 16, 2006, in Fresno, California.  Plaintiff appeared and testified with the assistance of a Hmong interpreter.  Plaintiff  was represented by attorney Charles Oren.  Vocational Expert ("VE") Judith Najarian and Yee Chang also testified.  AR 415-436.

Plaintiff lives in a home with his wife Yee Chang and eight of his ten children.  AR 419-420.  The oldest child living at home is eighteen years old; the youngest is five years old.  AR 420.  Plaintiff's income sources include food stamps and his wife's salary from Foster Farms.  His wife handles the family's finances.  AR 425.

---

[2] References to the Administrative Record will be designated as "AR," followed by the appropriate page number.

[3] A previous application was made on November 29, 1999.  That claim was denied initially and on reconsideration.  On July 10, 2002, ALJ Joanne S. Birge denied benefits.  ALJ Birge's decision references a prior application and denial determination.  AR 46-53.

[4] While it is difficult to discern the month portion of the date provided by Plaintiff regarding impairment due to the handwriting, January represents the Court's best interpretation.

[5] The transcript of the hearing includes apparent typographical errors regarding the date of the hearing. More particularly, on pages 415 and 417 of the Administrative Record, the year is incorrectly identified as 2005.

Plaintiff attended school in Laos for about three years.  AR 418.  He attended school in this country for about a year more than ten years ago.  AR 418-419.  He cannot learn or concentrate due to chest and back pain.  AR 419.  He reads a little English, but does not understand it.  He cannot write in English.  AR 419.  He occasionally watches television programs in English but he does not know what is being spoken.  AR 419.

Although he only drives once in a while, Plaintiff has a driver's license.  Occasionally he picks up his children from school.  AR 420.

Asked about his work history in this country, Plaintiff replied that in 1990 or 1991, he provided in home care for his ill mother.  AR 420-421.  He has not worked since that time.  AR 424.

Plaintiff typically rises at six or seven in the morning.  When he feels well, he helps with chores like vacuuming and washing the dishes.  AR 421-422.  If he feels bad, he cannot do anything as his hands and leg shake and his body is painful.  AR 421.

He has been using a single cane for about three years.  Previously Plaintiff used a "cane that had four legs" for about ten years.  AR 421.  He asked the doctor for a lighter cane, thus the one he currently uses.  AR 421.  He uses the cane for the pain in his back and weakness in his legs.  AR 422.  The pain in his leg radiates into his feet.  AR 422.

Because he cannot work or help himself, Plaintiff is depressed.  He feels worthless and has felt depressed for over ten years.  AR 422.  He sees a doctor for his depression and takes medication for the condition.  However, the medication no longer provides relief because he has been on it for so long.  AR 422-423.  He also suffers from sleep disturbance.  AR 423.

If he feels well, Plaintiff will walk outside for seven to ten minutes.  AR 423.  He does not go shopping with his family or visit friends.  AR 423.

The pain in his chest is a sharp pain that radiates through to his back.  AR 423-424.  He feels it every day.  AR 424.  Asked about his hands and feet, he testified they "feel sometimes very big and shaking."  On occasion he cannot pick up and hold onto items.  AR 424.

Plaintiff's back pain has become so severe that he cannot bend down to touch the floor. If he were to attempt to do so, he would feel pain in his lower back.  AR 424-425.

1    Asked about his physical capabilities, Plaintiff indicated he could lift and carry five

2  pounds, could stand for six or seven minutes at a time, or for twenty to thirty minutes throughout

3  the day, and could walk for six or seven minutes before needing to rest.  AR 425-427.  He can sit

4  for twelve to thirteen minutes at a time and could sit for about two hours during an eight-hour

5  period.  AR 426.

6    In March Plaintiff traveled to Laos.  He flew from Fresno to Los Angeles, and from Los

7  Angeles to Laos.  He did not recall how long the trip took, but stated that is seemed "like a whole

8  day."  AR 426-427.  Asked by counsel about his travel to Laos, Plaintiff explained that he did

9  have to sit for more than two hours, but he stood up and walked around, then would return to his

10  seat.  When he arrived in Laos he could "do nothing" and was "very tired and confused."  AR

11  427.  He traveled with his wife.  AR 428.

12    Yee Chang testified that she has been married to Plaintiff for almost twenty-five years.

13  AR 428.  She is currently employed at Foster Farms and has been there for six years.  AR 428-

14  429.  She cuts and packages chicken.  AR 429.

15    Ms. Chang testified that Plaintiff has not worked in the last fifteen years.  Initially

16  Plaintiff cared for his ill mother, but after a year he became ill and could not work.  He suffers

17  from back and chest pain and has since 1993.  AR 429.  Asked what her husband does all day,

18  Ms. Chang replied "[n]othing really."  He will get up and walk to the sofa, pick up trash or walk

19  around "outside one time" before returning to the house to lie on the sofa.  AR 429.

20    When Plaintiff was in Laos he was a soldier.  He was in a ditch and a bomb hit on top of

21  his hand and injured him.  Because he was young the pain did not affect him as much, however,

22  now that he is older the pain has worsened.  AR 429-430.  She had not met her husband at that

23  time so she did not know what year this occurred, but he told her about it.  AR 430.

24    Plaintiff's emotional problems have become very severe.  He suffers from memory

25  problems because he is forgetful.  AR 430.  She may take him with her to visit others, but he

26  does not speak to others.  AR 430-431.

27    Ms. Chang traveled with her husband to Laos.  They traveled there to "see his house" and

28  because of his illness and to find herbal medications.  AR 431.  She does not recall how long they

4

were in Laos but recalled it was after the new year.  They found "some tree, a root, herb

medication for him" that he has been taking every day.  AR 431.  The medications he was

prescribed here in the states do not help any more and the herbal medication from Laos is not

available here.  AR 431.  The herbal medication "takes a long time" to work so they are not sure

yet whether it will help.  AR 432.

Her husband cannot work because of his illness. It causes her a lot of stress.  Asked

whether she thought he would work if he were able, Ms. Chang replied that she did not think he

could work because he can do some "easy work like pick up the trash" or wash dishes, but he

cannot cook.  AR 432.

VE Najarian testified that Plaintiff's previous work as a home attendant is considered

medium with an SVP of 3.  Plaintiff performed the job at a heavy level however as he indicated

he would sometimes carry his mother. The position is semi-skilled when it involves

administering medication.  AR 433.

The VE was asked to consider hypothetical questions posed by the ALJ.  First, the VE

was asked to assume a fifty-three year old illiterate individual with the past work experience

described, with the ability to lift and carry 100 pounds occasionally and 50 pounds frequently,

with the ability to stand, walk and sit for six hours of an eight-hour work day, who can perform

simple repetitive tasks and can maintain attention, concentration, persistence and pace, has the

ability to relate to and interact with others and adapt to usual changes in the workplace and can

adhere to safety rules.  AR 434-435.  The VE opined that such an individual would be able to

perform work in the national economy whether it was light, medium or heavy and unskilled with

a reduction for the language barrier.  Three examples of available heavy work included hand

packaging with 8,777 available jobs in California and nine times that many in the nation; vehicle

cleaner with 5,663 available jobs in California, multiplied by nine for the nation; and production

worker with 3,945 jobs in California, and again multiplied by nine for national statistics.  AR

434.  The VE would apply a ninety-percent reduction to those figures to account for the language

barrier.  AR 435.

Next, the VE was asked to consider the same individual with the ability to lift and carry ten pounds maximum, and ability to stand, walk and sit for a total of three hours; the individual would be required to lie down for two hours. This hypothetical worker could occasionally use or operate foot controls, and occasionally climb, balance, stoop, crouch, kneel and crawl, could frequently reach and handle, but could not grasp or grip. The individual would also be precluded from exposure to unprotected heights and dangerous moving machinery. AR 435. The VE indicated this hypothetical worker would be unable to perform any work in the national economy. AR 435.

Lastly, the ALJ asked the VE to assume a hypothetical individual of the same vocational parameters previously provided, with the ability to lift and carry five pounds maximum, and ability to stand twenty to thirty minutes, walk for six to seven minutes, sit for a total of two hours, with difficulty maintaining attention, concentration, persistence and pace, and who would have difficulty remembering recent and distant events. AR 435-436. The VE indicated that such an individual would be unable to perform any work in the national economy. AR 436.

Medical Record

The entire medical record was reviewed by the Court. A summary of the most relevant reports and treatment notes is provided below.

**Heu Chiropractic**

Plaintiff treated at Heu Chiropractic from August 17, 2001, to October 29, 2001. He complained of headaches, neck pain, upper/middle/low back pain, chest wall pain, left hip pain, shoulder pain, lower and upper extremity numbness and pain, strain/sprain, spinal joint dysfunction and myofasciatis. AR 161-167, 171-174,

**Fresno Imaging Center**

X-rays of the cervical, thoracic and lumbar spine, and left knee, taken August 17, 2001, revealed minimal spondylosis at C6-7, in the cervical spine series; minimal spondylosis and mild scoliosis in the thoracic series; mild levoscoliosis in the lumbosacral spine series, but were otherwise normal. The findings regarding the left knee were unremarkable. AR 168-170.

1    ***Kings Winery Medical Clinic***

2         Numerous treatment notes reveal that Plaintiff was followed at the Kings Winery Medical

3    Clinic during 2001 through 2006.  He complained often of back, chest, and leg pain, as well as

4    numbness and weakness in the extremities.  Medications including Vicodin, Prevacid, Paxil,

5    Wellbutrin, Tagamet, Ultracet and others were prescribed.  Diagnoses included PTSD, MDD,

6    PUD/GERD, depression,  and myalgia.  AR 176-213, 255-258, 347-364, 390-411.

7         *John J. Lubenko, M.D.*

8         Dr. Lubenko completed a form entitled Complete Medical Report (Physical) on March

9    15, 2004.  It reports he has treated Plaintiff from December 1999 through to present.  He noted

10   clinical findings of chronic back pain and myalgia, and a diagnosis including chronic back pain,

11   myalgia, peptic ulcer disease and GERD.  He noted Plaintiff's response to treatment was good,

12   but his prognosis was poor.  AR 365.  The attached Medical Assessment of Ability to Do Work-

13   Related Activities (Physical) notes Dr. Lubenko believed Plaintiff capable of lifting and carrying

14   up to 10 pounds occasionally, sitting and standing or walking for a total of three hours in an

15   eight-hour work day but no more than an hour at one time, and lying down two hours in an eight-

16   hour day for no more than an hour at one time.  The use of Plaintiff's hands and feet were

17   occasionally affected.  AR 366-367.  Plaintiff could occasionally climb, balance, stoop, crouch,

18   kneel and crawl, could frequently reach and handle, occasionally push and pull, and continually

19   feel, hear and speak.  AR 368.  Environmental restrictions included heights and moving

20   machinery.  AR 369.

21        *Maximo Parayno, M.D.*

22        In a form entitled Complete Medical Report (Mental) dated March 22, 2004, Dr. Parayno

23   indicated he had treated Plaintiff from February 2002 to February 2004.  His clinical findings

24   included depressed mood, recurring nightmares, poor memory and concentration, and flashbacks.

25   He diagnosed posttraumatic stress disorder and major depressive disorder.  Dr. Parayno noted a

26   fair response to treatment and a guarded prognosis.  AR 370.  In the attached Medical

27   Assessment, Dr. Parayno found Plaintiff to have a poor ability to make any of the eight

28   occupational adjustments listed.  AR 371.  He had a poor ability to understand, remember and

carry out complex, detailed and simple job instructions.  AR 372.  Plaintiff had a fair ability to maintain personal appearance, but a poor ability to behave in an emotionally stable manner, relate predictably in social situations and to demonstrate reliability.  AR 372.  Dr. Parayno noted Plaintiff's ability to perform simple calculations, but inability to follow a two or three step process.  AR 372-373.

### Community Medical Centers

On January 16, 1997, Plaintiff was seen in the emergency room for complaints of abdominal pain.  AR 344-345.

Records note an admission on January 20, 1997, after paramedics transported Plaintiff for complaints of hematemesis.  Plaintiff's daughter reported he had been having abdominal pain for about one week.  Under the social history portion, the record indicates as follows: "The patient, however, does take methadone, probably history of intravenous drug abuse."  AR 333.  Following testing, Plaintiff was assessed with acute upper gastrointestinal tract bleeding and the need to rule out gastric, duodenal or esophageal ulcers was noted.  AR 334.  Plaintiff was admitted to the hospital for treatment.  AR 335.  Surgery was performed that date.  AR 336.  *See also* AR 337-343.

A January 24, 1997, discharge summary report notes Plaintiff's discharge diagnosis included acute upper gastrointestinal bleeding secondary to large gastric ulcer at the incisura requiring heater probe coagulation, and severe anemia secondary to acute gastrointestinal bleeding requiring blood transfusion. AR 331-332.

A postoperative report dated March 12, 1997, indicates Plaintiff underwent esophagogastroduodenoscopy surgery and biopsies were taken.  The surgeon noted "complete healing of the previously noted large gastric ulcer" and significant gastritis.  AR 328-330.

Chest x-rays taken January 31, 2002, established lower left lobe consolidation and effusion consistent with pneumonia.  AR 202, 327.

On April 29, 2002, chest x-rays for recurrent pneumonia revealed persistent residual left lower lobe infiltrate, decreased from the previous study.  AR 191, 326.

X-rays taken August 16, 2002, of the chest for a pulmonary follow up revealed small parenchymal scars at the left base with blunting of the left costophrenic angle by pleural fibrosis, yet were otherwise normal.  AR 178, 325.

On September 8, 2003, was seen in the emergency department for abdominal pain.  He was treated and released that same day.  AR 317-324.

An MRI of the thoracic spine taken March 30, 2004, revealed moderate dextroconvex scoliosis, no acute fracture or dislocation and preserved disc spaces.  The impression was scoliosis but otherwise unremarkable.  AR 388.  That same date, an examination of the lumbar spine revealed no radiographic evidence of acute fracture, spondylolysis or spondylolisthesis and preserved disc spaces.  AR 389.

**Wishon Radiological Medical Group, Inc.**

A February 11, 2002, sonogram of the abdomen for complaints of pain was unremarkable.  AR 200.

**Fresno County Mental Health**

All records have been reviewed, however, for the sake of brevity, a sampling of progress notes and other reports are included in the Court's summary as follows.  *See also* AR 215-253, 269-280, 299-316, 374-387.

In an August 8, 2001, group therapy session, Plaintiff reported general stress regarding living in the states, despair because he cannot read, write or speak English, and hopelessness because he is unable to help his family.  AR 251.

On October 29, 2001, Plaintiff reported doing very little at home, feelings of worthlessness and helplessness, medical problems, and poor appetite.  He stated he was medication compliant but reported the medication did not do much for him.  AR 241.

In a May 17, 2002, comprehensive assessment, it was noted that Plaintiff voluntarily sought treatment for depression.  He complained of depression, fatigue, poor sleep, anger, low stress tolerance, crying spells, nightmares, intrusive memories, flashbacks and difficulty with concentration and memory.  He denied alcohol or drug abuse, but admitted cigarette smoking.  AR 224-225.  It was noted he was calm and cooperative, related with the examiner, speech was

normal as were mood and affect.  AR 224.  He was oriented to time, place, person and situation.

He denied hallucinations, distortions and delusions, but acknowledged flashbacks related to the

war.  His thought flow was logical, rational, focused and coherent.  Thought content was

preoccupied by health issues.  His immediate recall memory was intact, and short-term, recent

and long-term memory were fair.  Abstraction, interpretation, judgment and insight were fair.  He

denied homicidal ideation and admitted a prior suicide attempt in 1997.  AR 221.  Doan. T.

Truong, MSW, UMHC, diagnosed major depressive disorder and posttraumatic stress disorder.

AR 222.

On June 28, 2002, Plaintiff stated he was doing very little in the way of activity,

complained of medical problems, nightmares and sleeplessness, as well as anger.  AR 219.

Plaintiff complained of medical problems, helplessness and hopelessness, sleep

disturbances, fatigue and poor appetite on July 30, 2002.  AR 218.

On August 28, 2002, Plaintiff complained of feelings of worthlessness, helplessness and

hopelessness, stress regarding daily pain, fatigue and sleeplessness.  AR 217.

On September 30, 2002, Plaintiff continued to feel depressed about daily medical

problems.  He complained of an inability to sleep and nightmares, and was considering continued

participation in group therapy.

### Edward R. Mosley, M.D./Valley Health Resources

In an internal medicine evaluation dated May 20, 2003, Dr. Mosley noted Plaintiff's chief

complaints of back and chest pain, and peptic ulcer disease.  AR 281.  Dr. Mosley's physical

examination noted a well-developed, Hmong male who was "somewhat histrionic."  It was noted

Plaintiff "gave little effort" in grip strength and did not need assistance walking "throughout the

office."  Range of motion in the neck was within normal limits, heart tones were of good quality

and there was no tenderness in the chest.  AR 283.  The abdomen was not tender.  The back was

not tender to palpitation in the midline or paraspinal areas.  Straight leg raising was negative at

ninety degrees; no muscle spasm was present and muscle tone was equal.  Upper and lower

extremity testing revealed range of motion all within normal limits.  AR 284.  Strength was 5/5

in all extremities, reflexes and pulses were normal and gait was normal with a cane.  The doctor

1  noted that although Plaintiff walked with the aid of a cane, he could "find no reason to

2  substantiate the need for it" and there were no objective findings that would preclude physical

3  activities.  Dr. Mosley's diagnostic impressions included back pain without evidence of sciatic

4  involvement; chest pain, atypical for angina pectoris; and peptic ulcer disease by history.  AR

5  285.

6     ***Ekram Michiel, M.D./Valley Health Resources***

7    On May 31, 2003, Dr. Ekram Michiel completed a psychiatric evaluation following

8  examination of Plaintiff.  AR 286-289.  Plaintiff complained of being depressed, and suffering

9  from various physical ailments.  Plaintiff stated he was able to take care of his personal hygiene,

10  but does not shop or help with household chores because he is too tired.  AR 287.  With regard to

11  mental status, Dr. Michiel reported Plaintiff was cooperative, maintained fair eye contact and

12  exhibited normal speech and body language.  AR 287.  He was oriented to place and could recall

13  three of three objects after one minute and five minutes.  AR 288.  He did not correctly answer a

14  simple mathematical calculation and could not explain the similarity between an apple and an

15  orange.  AR 288.  Plaintiff's mood was depressed, his affect was restricted; he denied suicidal or

16  homicidal ideations.  AR 288.  His thought process was goal-directed, content was normal, and

17  did not suffer from delusions.  He did advise he hears the voices of his dead friends, but there

18  was no indication of any distraction or response to any internal stimuli during the interview.  AR

19  288.

20    Dr. Michiel diagnosed depressive disorder, not otherwise specified.  He noted a history of

21  arthritis and a stressor related to health conditions.  A Global Functioning Assessment ("GAF")[6]

22  score of 55-60 was recorded.  AR 288.  Dr. Michiel concluded Plaintiff is able to maintain

23  adequate attention and concentration and to carry out simple one or two step job instructions.  He

24  believed Plaintiff could relate and interact appropriately with coworkers, supervisors and the

25  general public, but should avoid carrying out an extensive variety of technical or complex

26  ────────────

27    [6]A GAF score is a generalized description of the claimant's level of psychological symptoms.  *See* DSM-IV
at 32 (4th Ed.  2000) (DSM IV).  The Commissioner has determined the GAF scale "does not have a direct

28  correlation to the severity requirements in [the Social Security Administration's] mental disorders listings." 65
Fed.Reg. 50,746, 50,765 (Aug. 21, 2000).

1   instructions.  AR 288.  Lastly, the doctor noted that Plaintiff is unable to handle his own funds

2   because he is unfamiliar with this country's currency.  AR 289.

3           ***Psychiatric Review Technique***

4           Carmen E. Lopez, M.D., performed a psychiatric review on December 19, 2002.  Dr.

5   Lopez determined Plaintiff's affective disorder was not severe and noted clinical depression.  AR

6   259-260.  No functional limitations were identified and no evidence revealed episodes of

7   decompensation of an extended duration or other "C" criteria.  AR 261-262.

8           Archimedes Garcia, M.D., performed a psychiatric review on July 24, 2003.  Dr. Garcia

9   found Plaintiff to be moderately limited in his ability to carry out detailed instructions;

10  nevertheless, he found Plaintiff was not significantly limited in any other category pertaining to

11  understanding and memory, or sustained concentration and persistence.  AR 292.  Additionally,

12  Dr. Garcia opined Plaintiff was not significantly limited in any social interaction, nor were his

13  ability in adaptation impaired.  AR 293.  With specific regard to the functional capacity

14  assessment, Dr. Garcia noted Plaintiff is able to understand, remember and carry out simple

15  instructions, can sustain attention and concentration for extended periods, is able to relate and

16  interact appropriate with others, and is able to adapt to usual work situations and deal with

17  routine changes.  AR 294.

18              ALJ's Findings

19          The ALJ determined that Plaintiff had not engaged in substantial gainful activity since

20  August 21, 2002, and had the severe impairments of a major depressive disorder and

21  posttraumatic stress disorder.  AR 21.  Nonetheless, the ALJ determined that none of the severe

22  impairments met or exceeded one of the listing impairments.  AR 21-22.

23          Based on his review of the medical evidence, the ALJ determined that Plaintiff retained

24  the residual functional capacity ("RFC") to perform a significant number of jobs.  He could lift

25  and carry 100 pounds occasionally and 50 pounds frequently, could stand, walk and sit for six

26  hours in an eight-hour workday, could perform simple repetitive tasks, maintain attention,

27  concentration, persistence and pace, relate to and interact with others, adapt to usual changes in

28  work setting and adhere to safety rules.  AR 22.

1    The claimant had no past relevant work.  Nevertheless, the ALJ found that Plaintiff had

2    the RFC to perform jobs that exist in significant numbers in the national economy.  AR 25-26.

3    **SCOPE OF REVIEW**

4    Congress has provided a limited scope of judicial review of the Commissioner's decision

5    to deny benefits under the Act.  In reviewing findings of fact with respect to such determinations,

6    the Court must determine whether the decision of the Commissioner is supported by substantial

7    evidence.  42 U.S.C. § 405 (g).  Substantial evidence means "more than a mere scintilla,"

8    *Richardson v. Perales*, 402 U.S. 389, 402 (1971), but less than a preponderance.  *Sorenson v.*

9    *Weinberger*, 514 F.2d 1112, 1119, n. 10 (9th Cir. 1975).  It is "such relevant evidence as a

10   reasonable mind might accept as adequate to support a conclusion."  *Richardson*, 402 U.S. at

11   401.  The record as a whole must be considered, weighing both the evidence that supports and

12   the evidence that detracts from the Commissioner's conclusion.  *Jones v. Heckler,* 760 F.2d 993,

13   995 (9th Cir. 1985).  In weighing the evidence and making findings, the Commissioner must

14   apply the proper legal standards.  *E.g.*, *Burkhart v. Bowen*, 856 F.2d 1335, 1338 (9th Cir. 1988).

15   This Court must uphold the Commissioner's determination that the claimant is not disabled if the

16   Secretary applied the proper legal standards, and if the Commissioner's findings are supported by

17   substantial evidence.  *See Sanchez v. Sec'y of Health and Human Serv.*, 812 F.2d 509, 510 (9th

18   Cir. 1987).

19   **REVIEW**

20   In order to qualify for benefits, a claimant must establish that he is unable to engage in

21   substantial gainful activity due to a medically determinable physical or mental impairment which

22   has lasted or can be expected to last for a continuous period of not less than twelve months.  42

23   U.S.C. § 1382c (a)(3)(A).  A claimant must show that he has a physical or mental impairment of

24   such severity that he is not only unable to do her previous work, but cannot, considering his age,

25   education, and work experience, engage in any other kind of substantial gainful work which

26   exists in the national economy.  *Quang Van Han v. Bowen*, 882 F.2d 1453, 1456 (9th Cir. 1989).

27   The burden is on the claimant to establish disability.  *Terry v. Sullivan*, 903 F.2d 1273, 1275 (9th

28   Cir. 1990).

1    In an effort to achieve uniformity of decisions, the Commissioner has promulgated

2    regulations which contain, inter alia, a five-step sequential disability evaluation process.  20

3    C.F.R. §§ 404.1520 (a)-(f), 416.920 (a)-(f) (1994).  Applying this process in this case, the ALJ

4    found that Plaintiff: (1) had not engaged in substantial gainful activity since the alleged onset of

5    his disability; (2) has an impairment or a combination of impairments that is considered "severe"

6    based on the requirements in the Regulations (20 CFR §§ 416.920(b)); (3) does not have an

7    impairment or combination of impairments which meets or equals one of the impairments set

8    forth in Appendix 1, Subpart P, Regulations No. 4; (4) cannot perform his past relevant work as a

9    janitor or dishwasher; yet (5) retained the RFC to perform light work.  AR 11-18.

10   Here, Plaintiff argues that the ALJ impermissibly dismissed the examining physician's

11   opinion, improperly considered his pain and subjective complaints, erred in his RFC finding and

12   finding that Plaintiff could perform other work.  He contends this Court should reverse and order

13   the immediate payment of benefits.

## DISCUSSION

### A.    *ALJ Bias*

16   Plaintiff contends ALJ Berry is biased against his attorney Jeffrey Milam to the detriment

17   of Plaintiff.  (Doc. 22 at 7-15.)  Defendant replies Plaintiff's argument is disingenuous and is not

18   supported by the record.  (Doc. 6-7.)

19   More particularly, Plaintiff argues that because ALJ Berry was found to be biased in a

20   previous matter determined by this Court, wherein it was suggested that ALJ Berry should give

21   serious consideration to recusing himself from claims involving Mr. Milam and his firm to avoid

22   the appearance of impropriety, ALJ Berry was biased against Plaintiff here and should have

23   recused himself.  In support of this position, Plaintiff has extensively quoted from the opinion in

24   *Hixson v. Astrue*, 1:06-cv-00353-OWW-DLB.

25   When faced with a claim of bias, the Court must start with the presumption that

26   administrative adjudicators are unbiased and that they exercise their decision-making authority

27   with honesty and integrity.  *See Schneider v. McClure*, 456 U.S. 188, 195-196 (1982); *Withrow v.*

28   *Larkin*, 421 U.S. 35, 47 (1975); *Rollins v. Massanari*, 261 F.3d 853, 857-58 (9th Cir. 2001)

1   (citing *Verduzco v. Apfel*, 188 F.3d 1087, 1089 (9th Cir. 1999)).  This presumption can be

2   rebutted by a showing of a conflict of interest or by showing some other specific reason for

3   disqualification.  *Schneider*, 456 U.S. at 195.  The burden of overcoming this presumption rests

4   with the Plaintiff.  *Id.* at 196.  As stated in *Rollins*, Plaintiff must establish "the ALJ's behavior,

5   in the context of the whole case, was so extreme as to display clear inability to render fair

6   judgment."  *Rollins v. Massnari*, 261 F.3d at 858 (internal quotation marks omitted).

7          Here, ALJ Berry is presumed to be unbiased.  *Schneider v. McClure*, 456 U.S. at 195-196.

8   Plaintiff has failed to establish any evidence of bias in the context of this particular case.

9   Plaintiff would apparently have this Court reverse and remand ALJ Berry's findings in any case

10  involving Mr. Milam or his firm's representation of the claimant based merely on the existence

11  of the *Hixson* decision.  This is completely contrary to the prevailing authority.  More

12  importantly, this case has none of the contentious behavior identified in the *Hixson* matter.  The

13  exchanges between all parties at the May 5, 2006, hearing were completely professional and

14  pleasant.  *See* AR 415-436. ALJ Berry did not exhibit any behavior here "so extreme as to

15  display clear inability to render fair judgment."  *Rollins v. Massanari*, 261 F.3d at 858.  There is

16  nothing in the instant record to indicate that ALJ Berry exercised his decision-making authority

17  with anything but honesty and integrity.  *Schneider*, at 195-196; *Rollins*, at 857-858.

18         Plaintiff's references to various statistics regarding ALJ Berry's findings in the matters

19  handled by counsel's office compared to national averages are likewise unavailing.  The

20  information is irrelevant to this particular case and is therefore insufficient to establish bias.

21         Notably too, the hearing in this matter occurred prior to the decision in the *Hixson* matter.

22  The *Hixson* findings are dated September 14, 2007, and judgment was entered October 5, 2007,

23  yet ALJ Berry's decision in this matter issued more than one year earlier on September 1, 2006.

24  Thus, even assuming arguendo this Court were to find bias by ALJ Berry in matters following the

25  *Hixson* decision, it would not do so here because *Hixson* had not yet been decided.

26         Finally, at page 3 of his reply brief, Plaintiff's counsel Sengthiene Bosavath includes an

27  unsigned, "sworn statement," purportedly by Jeffrey Milam of counsel's firm, wherein Mr.

28  Milam claims ALJ Berry has "consistently" made his life miserable for he and his associates

1  since 1997.  Counsel states ALJ Berry denies "95%" of his client's cases, "a rate that is

2  inconsistent with the rest of the local bar" and claims ALJ Berry has retaliated against him

3  following the *Hixson* decision, including refusing to recuse himself as requested.  Additionally,

4  ALJ Berry makes "adverse facial gestures" at he and his clients, among other purported tactics.

5  (*See* Doc. 27 at 3.)

6       Again, an ALJ is presumed to be unbiased.  *Schneider v. McClure*, 456 U.S. at 195-196.

7  Counsel's sworn statement, even were it signed, does not overcome the presumption because it is

8  not supported by any evidence in the record.  Had the record demonstrated counsel's assertions to

9  be fact, this Court may have found bias.  To state it more plainly, the record in *this* case is

10 absolutely void of any bias on the part of ALJ Berry.

11      In sum, Plaintiff has failed to overcome the presumption that an administrative

12 adjudicator is unbiased.  ALJ Berry rendered fair judgment.  Morever, this Court will not

13 presume bias simply because it previously determined this particular ALJ was biased in another

14 matter.

15      **B.    *The Treating Physician Opinions***

16      Plaintiff contends the ALJ improperly rejected the opinions of his psychiatrist and general

17 practitioner.  (Doc. 22 at 15-17.)  The Commissioner responds the ALJ properly evaluated the

18 opinion evidence.  (Doc. 26 at 7-11.)

19      The opinions of treating doctors should be given more weight than the opinions of

20 doctors who do not treat the claimant.  *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998);

21 *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995).  Where the treating doctor's opinion is not

22 contradicted by another doctor, it may be rejected only for "clear and convincing" reasons

23 supported by substantial evidence in the record.  *Lester*, 81 F.3d at 830.  Even if the treating

24 doctor's opinion is contradicted by another doctor, the ALJ may not reject this opinion without

25 providing "specific and legitimate reasons" supported by substantial evidence in the record.  *Id.*

26 (quoting *Murray v. Heckler*, 722 F.2d 499, 502 (9th Cir. 1983)).  This can be done by setting out

27 a detailed and thorough summary of the facts and conflicting clinical evidence, stating his

28 interpretation thereof, and making findings.  *Magallanes  v. Bowen*, 881 F.2d 747, 751 (9th Cir.

1989).  The ALJ must do more than offer his conclusions.  He must set forth his own

interpretations and explain why they, rather than the doctors', are correct.  *Embrey v. Bowen*, 849

F.2d 418, 421-22 (9th Cir. 1988).  Therefore, a treating physician's opinion must be given

controlling weight if it is well-supported and not inconsistent with the other substantial evidence

in the record.  *Lingenfelter v. Astrue*, 504 F.3d 1028 (9th Cir. 2007).

In *Orn v. Astrue,* 495 F.3d 625 (9th Cir. 2007), the Ninth Circuit reiterated and

expounded upon its position regarding the ALJ's acceptance of the opinion an examining

physician over that of a treating physician.  "When an examining physician relies on the same

clinical findings as a treating physician, but differs only in his or her conclusions, the conclusions

of the examining physician are not '"substantial evidence."'  *Orn,* 495 F.3d at 632; *Murray*, 722

F.2d at 501-502.  "By contrast, when an examining physician provides 'independent clinical

findings that differ from the findings of the treating physician' such findings are 'substantial

evidence.'"  *Orn*, 496 F.3d at 632; *Miller v. Heckler*, 770 F.2d 845, 849 (9th Cir. 1985).

Independent clinical findings can be either (1) diagnoses that differ from those offered by another

physician and that are supported by substantial evidence, *see Allen v. Heckler*, 749 F.2d 577, 579

(9th Cir.1985), or (2) findings based on objective medical tests that the treating physician has not

herself considered, *see Andrews*, 53 F.3d at 1041.

If a treating physician's opinion is not giving controlling weight because it is not well

supported or because it is inconsistent with other substantial evidence in the record, the ALJ is

instructed by Section 404.1527(d)(2) to consider the factors listed in Section 404.1527(d)(2)-(6)

in determining what weight to accord the opinion of the treating physician.  Those factors include

the "[l]ength of the treatment relationship and the frequency of examination" by the treating

physician; and the "nature and extent of the treatment relationship" between the patient and the

treating physician.  20 C.F.R. 404.1527(d)(2)(i)-(ii).  Other factors include the supportablility of

the opinion, consistency with the record as a whole, the specialization of the physician, and the

extent to which the physician is familiar with disability programs and evidentiary requirements.

20 C.F.R. § 404.1527(d)(3)-(6).  Even when contradicted by an opinion of an examining

physician that constitutes substantial evidence, the treating physician's opinion is "still entitled to

17

1   deference."  SSR 96-2p; *Orn*, 495 F.3d at 632-633.  "In many cases, a treating source's medical

2   opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the

3   test for controlling weight."  SSR 96-2p; *Orn*, 495 F.3d at 633.

4          Here, ALJ Berry found as follows:

5                  Pursuant to the Appeals Council's Remand Order, I requested clarification
           from Drs. Lubenko and Parayno, but nothing was ever received.  I assign no
6          weight to [their opinions] because these medical source statements are not
           supported by the objective medical evidence.  In so concluding, I note Dr.
7          Lubenko reported claimant could not grip or grasp; however, this is contrary to all
           of the physical evidence and is in direct contradiction of claimant's frequent use
8          of a cane.  Furthermore, it is notable that Dr. Moseley reported hand grip was
           "normal," and finger approximation was intact.
9

10  (AR 23, internal citations omitted.)  Additionally, the ALJ noted that "[c]ontrary to Dr. Parayno's

11  opinion regarding the claimant's mental status as well as treatment notes, the claimant was and is

12  preoccupied with his alleged physical impairments.  (AR 24, internal citations omitted.)

13         The ALJ's reasons for rejecting Dr. Lubenko's opinion is supported by the evidence.

14  More particularly, Plaintiff himself testified that he had used a cane for more than ten years.  AR

15  421-422.  This information in light of the objective medical findings of Dr. Mosley - wherein

16  examination revealed a normal grip and intact finger approximation - amounts to specific and

17  legitimate reasons for discounting the opinion of a treating physician as Dr. Mosley's opinion

18  contradicts Dr. Lubenko's findings.  *See Tonapetyan v. Halter*, 242 F.3d 1144, 1149 (9th Cir.

19  2001) (noting that contrary opinion of examining source constituted "specific and legitimate

20  reason" for rejecting opinion of a treating source); *Andrews v. Shalala*, 53 F.3d 1035, 1041 (9th

21  Cir. 1995) ("Where the opinion of the claimant's treating physician is contradicted, and the

22  opinion of a nontreating source is based on independent clinical findings that differ from those of

23  the treating physician, the opinion of the nontreating source may itself be substantial evidence; it

24  is then solely the province of the ALJ to resolve the conflict").

25         As to the opinion of Dr. Parayno, the doctor indicated he treated Plaintiff from February

26  2002 through February 2004.  AR 370.  The mental status report prepared is a check-the-box

27  form.  A brief and conclusionary form opinion which lacks supporting clinical findings is a

28  legitimate reason to reject a treating physician's conclusion.  *Magallenes v. Bowen*, 881 F.2d 747,

751 (9th Cir. 1989).  A review of the objective findings noted in Dr. Parayno's treatment records reveal Plaintiff was generally alert, oriented and coherent, but his mood was depressed or affect flat.  References to poor memory and forgetfulness are accompanied by the doctor's notation that it was reported or complained of by Plaintiff.  *See* AR 183 ["*reports* poor memory + forgetfulness"], 198 ["*reports* poor memory . . . *reports* forgetfulness"]; 201 ["c/o poor memory . . . *reports* forgetfulness"], 257 ["c/o poor memory + forgetful"], 258 ["c/o poor memory, forgetfulness"], 349 ["c/o poor memory + forgetful"], 352 ["c/o poor memory + is forgetful"], 364 ["c/o poor memory . . . forgetful"].  An ALJ may reject the treating physician's opinion because it was based on the claimant's discredited subjective complaints.  *Thomas v. Barnhart,* 278 F.3d 948, 957 (9th Cir. 2002); *Morgan v. Commissioner of Social Sec. Admin.*, 169 F.3d 595, 602 (9th Cir. 1999) (a treating physician's opinion based to a large extent on claimant's own accounts of symptoms and limitations may be disregarded where those complaints have been properly discounted).  Thus, Dr. Parayno's statement is not supported by objective medical evidence as noted by the ALJ.

Moreover, Dr. Parayno's opinion is contradicted by the opinion of consulting psychiatrist Ekram Michiel.  AR 286-289.  Dr. Michiel's opinion, in turn, was supported by Dr. Garcia, a state agency physician.  AR 282-294.  The contrary opinion of an examining source is a specific and legitimate reason for discounting the opinion of a treating physician.  *Tonapetyan v. Halter*, 242 F.3d at 1149; *Andrews v. Shalala*, 53 F.3d at 1041.

In conclusion, the ALJ's findings are supported by substantial evidence and are free of legal error.

**C.    *The RFC Finding***

Plaintiff asserts the ALJ erred by failing to perform a function-by-function RFC assessment.  (Doc. 22 at 17-18.)  Defendant contends the ALJ's RFC finding is supported by substantial evidence.  (Doc. 26 at 11.)

RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis of eight hours a day, for five days a week, or equivalent work schedule.  SSR 96-8p.  The RFC assessment considers only

1   functional limitations and restrictions which result from an individual's medically determinable

2   impairment or combination of impairments.  SSR 96-8p.  "In determining a claimant's RFC, an

3   ALJ must consider all relevant evidence in the record including, inter alia, medical records, lay

4   evidence, and 'the effects of symptoms, including pain, that are reasonably attributed to a

5   medically determinable impairment.' " *Robbins v. Social Security Admin.*, 466 F.3d 880, 883

6   (9th Cir. 2006).

7          The RFC requires the ALJ to consider a claimant's ability to meet certain job demands,

8   such as physical demands, mental demands, sensory requirements, and other functions.  20

9   C.F.R. §§ 404.1545(a), 416.945(a).  As such, an assessment of the claimant's exertional

10  limitations (sitting, standing, walking, lifting and carrying abilities) and non-exertional

11  limitations (postural and manipulative abilities and mental capacity) is required.  SSR 96-8p.

12  Social Security Ruling 96-8p requires the RFC to identify a claimant's functional limitations or

13  restrictions and assess his or her work-related abilities on a function-by-function basis.  This

14  includes the functions related to the claimant's physical abilities, mental abilities, and any other

15  abilities affected by the claimant's impairment or impairments.  20 C.F.R. §§ 404.1545(b)-(d);

16  416.945(b)-(d).  Pursuant to the narrative discussion requirement provided in SSR 96-8, the RFC

17  assessment must contain a "thorough discussion and analysis" of the objective medical and other

18  evidence, including pain, and a "logical explanation of the effects of these symptoms on the

19  individual's ability to work."  SSR 96-8.

20         ALJ Berry's RFC findings provides that Plaintiff is capable of lifting and carrying 100

21  pounds occasionally and 50 pounds frequently, standing, walking or sitting for six hours each in

22  an eight-hour workday, performing simple, repetitive tasks, with the ability to maintain attention,

23  concentration, persistence and pace, relate to and interact with others, adapt to usual changes in

24  work settings and adhere to safety rules.  Plaintiff's capacity for heavy work was noted to be

25  substantially intact and was not significantly limited by any nonexertional limitations.  AR 22.

26         The ALJ assessed Plaintiff's exertional limitations (sitting, standing, walking, lifting and

27  carrying abilities) and non-exertional limitations (postural and manipulative abilities and mental

28

1  capacity) and mental abilities as required.  The ALJ's findings contain a thorough discussion and

2  analysis and a logical explanation as required by SSR 96-8.

3         Plaintiff contends the ALJ's conclusions are inconsistent in that he found no severe

4  physical impairment, yet in addition to finding mental impairment, the ALJ limited standing and

5  walking to six hours rather than eight hours per day.  Plaintiff asserts that because Dr. Lubenko

6  identified severe physical limitations the ALJ's conclusions are not supportable.  (Doc. 22 at 17.)

7  As the Commissioner correctly points out however, Plaintiff's claim fails because ALJ Berry

8  considered all relevant evidence in making his RFC finding.  The ALJ's limitations are supported

9  by the record, and the limitations not adopted were those that depended upon Plaintiff's

10  subjective complaints or were properly rejected opinions.  (Doc. 26 at 11.)

11         The ALJ's finding is supported by substantial evidence and is free of legal error.

12         **D.    *Plaintiff's Credibility***

13         Plaintiff complains the ALJ did not provide clear and convincing reasons for discounting

14  Plaintiff's complaints.  Plaintiff states the ALJ provided little basis for his conclusions, was

15  biased in his finding regarding drug use, and made inappropriate "racial or cultural conclusions"

16  about Plaintiff's depression.  He also takes issue with the ALJ's determination that Plaintiff's

17  wife was not credible.  (Doc. 22 at 18-21.)  Defendant responds the ALJ's reasons were clear and

18  convincing.  More particularly, the Commissioner contends the medical records support the

19  ALJ's findings because they include essentially normal findings despite Plaintiff's claims of

20  constant pain, the mental health report was not incomplete, Plaintiff's work history was abysmal

21  and affected credibility, Plaintiff's travel to Laos was a proper credibility consideration, and the

22  drug abuse referenced is documented in the treatment records.  (Doc. 26 at 12-15.)

23         A two step analysis applies at the administrative level when considering a claimant's

24  credibility.  *Smolen v. Chater*, 80 F.3d 1273, 1281 (9th Cir.1996).  First, the claimant must

25  produce objective medical evidence of an impairment that could reasonably be expected to

26  produce some degree of the symptom or pain alleged.  *Id.* at 1281-1282.  If the claimant satisfies

27  the first step and there is no evidence of malingering, the ALJ may reject the claimant's testimony

28  regarding the severity of his symptoms only if he makes specific findings that include clear and

1    convincing reasons for doing so. *Id*. at 1281. The ALJ must "state which testimony is not

2    credible and what evidence suggests the complaints are not credible." *Mersman v. Halter*, 161

3    F.Supp.2d 1078, 1086 (N.D. Cal. 2001), quotations & citations omitted ("The lack of specific,

4    clear, and convincing reasons why Plaintiff's testimony is not credible renders it impossible for

5    [the] Court to determine whether the ALJ's conclusion is supported by substantial evidence");

6    Social Security Ruling ("SSR") 96-7p (ALJ's decision "must be sufficiently specific to make

7    clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the

8    individual's statements and reasons for that weight").

9       An ALJ can consider many factors when assessing the claimant's credibility. *See Light v.*

10   *Soc. Sec. Admin.*, 119 F.3d 789, 792 (9th Cir.1997). The ALJ can consider the claimant's

11   reputation for truthfulness, prior inconsistent statements concerning his symptoms, other

12   testimony by the claimant that appears less than candid, unexplained or inadequately explained

13   failure to seek treatment, failure to follow a prescribed course of treatment, claimant's daily

14   activities, claimant's work record, or the observations of treating and examining physicians.

15   *Smolen*, 80 F.3d at 1284; *Orn v. Astrue*, 495 F.3d 625, 638 (2007).

16       The first step in assessing Plaintiff's subjective complaints is to determine whether

17   Plaintiff's condition could reasonably be expected to produce the pain or other symptoms

18   alleged. *Lingenfelter v. Astrue*, 504 F.3d 1028, 1036 (9th Cir. 2007). The ALJ found that

19   Plaintiff had two severe impairments, i.e., major depressive disorder and post traumatic stress

20   disorder. AR 21. When making his finding as to Plaintiff's RFC, the ALJ found that

21   "[Plaintiff's] medically determinable impairments could reasonably be expected to produce the

22   alleged symptoms, but that the [Plaintiff's] statements concerning the intensity, persistence and

23   limiting effects of these symptoms are not entirely credible." AR 22. This finding satisfied step

24   one of the credibility analysis. *Smolen*, 80 F.3d at 1281-1282.

25       Because the ALJ did not find that Plaintiff was malingering, he was required to provide

26   clear and convincing reasons for rejecting Plaintiff's testimony. *Smolen*, 80 F.3d at 1283-1284;

27   *Lester v. Chater*, 81 F.3d at 834. When there is evidence of an underlying medical impairment,

28   the ALJ may not discredit the claimant's testimony regarding the severity of his symptoms solely

because they are unsupported by medical evidence. *Bunnell v. Sullivan*, 947 F.2d 341, 343 (9th Cir. 1991); SSR 96-7.  Moreover, it is not sufficient for the ALJ to make general findings; he must state which testimony is not credible and what evidence in the record leads to that conclusion. *Dodrill v. Shalala*, 12 F.3d 915, 918 (9th Cir. 1993); *Bunnell*, 947 F.2d at 345-346.

Here, the ALJ found, in pertinent part, as follows:

> Both the claimant and his wife, Ye[e] Chang, testified claimant has back pain which renders him incapable of working.  He alleges he needs a cane because of back pain, weakness and pain in his feet.  He testified he is weak and shakes, and cannot bend due to low back pain.  The claimant also testified he has pains in his legs and hands.  He said that some days his hands and legs shake. He related he walks around outside for 10 minutes, and then lies down.  He said he does not shop with his family, and has no friends.  The claimant had a cane at the hearing, and stated he had used it for 2 years.  Before that, he had a 4-prong cane and used it for 10 years.  Mr. Yang also testified he owns a car, can lift and carry 5 pounds, can stand for 6-7 minutes, or a total of 20-30 minutes, can walk 6-7 minutes, then needs to rest.  He related he could sit for 12-13 minutes, or 2 hours total in an 8-hour day.  Notwithstanding, Mr. Yang also testified he went to Laos in March, 2006, and stayed for a month-long visit for a death in the family.  (His wife later testified the trip was to buy herbal medicine for his ailments.)  He said he flew from Fresno to Los Angeles, and it took an entire day to get to Laos.  He claims he could do nothing when he arrived.  When the claimant's representative pointed out to him he had to sit more than 2 hours during the flight to Laos, the claimant then testified he stood up and walked around on the airplane.  The claimant's wife testified he has had back and chest pain ever since 1993.  She stated he was injured while being a soldier in Laos and his condition was worsened since then.  She related he took care of his mother for 1 year, and then got ill.  She alleges the claimant does nothing during the day.  She testified he gets up and then sits on the sofa, or he walks around and then lies down.  She related she went to Laos with him to get some herb medication which claimant takes everyday, but she said he is still ill and unable to work.  She said it would take a long time to see if the medication was helpful.  Ms. Chang related he could do some "easy" work such as emptying the trash.

> In terms of credibility, claimant's and his wife's in quite poor under SSR 96-7p.  Their testimony is unsupported by the evidence of record as radiologic studies including a lumbosacral spine series, thoracic spine series, and cervical spine series showed only minimal or mild findings.  Repeat films of the lumbar spine dated from March 30, 2004, were unremarkable with no evidence of an acute fracture.  An x-ray of the thoracic spine, March 30, 2004, showed scoliosis, otherwise unremarkable.  Furthermore, the consulting internist, Dr. Edward Mosley, reported in May, 2003, there was no tenderness to palpitation in the midline or paraspinal areas, and straight leg raising was negative at 90 degrees.  There was no muscle spasm and muscle tone appeared to be equal throughout.  Although the claimant testified to leg weakness, Dr. Mosley reported he had good tone bilaterally with good active motion, and strength was 5/5 (normal) in all extremities.  There was also testimonial evidence that claimant experiences chest pains.  He testified he has sharp chest pains that radiate to his back and this happens on a daily basis.  The claimant reported to Dr. Mosley that chest pain followed a concussion injury while he was in the service.  He was not hospitalized at the time.  He described the pain as a stabbing sensation that last for 2 to 3 hours, and seems to be worse at night, and can be precipitated by lifting, straining,

twisting.  For relief, he using needling, cupping, medications and rest.  However, the cardiac examination showed heart tones were of good quality, and there were no murmurs, thrills or rubs, and the PMI was in the fourth intercostal space. There was no tenderness in the chest.  Accordingly, Dr. Mosley opined the claimant had back pain without evidence of sciatic involvement and chest pain, atypical for angina pectoris.  Dr. Mosley added that although he walked with a cane, he found "no reason to substantiate the need for it."  Furthermore, there was no objective findings which would support restriction of his physical activities. Therefore, the cane is merely for claimant's apparent convenience since there is no objective evidence to support a need therefor.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

There was testimonial evidence that the claimant suffers from depression. He testified he is depressed which means, at least in his opinion, he cannot work and his family does not want him any more.  He alleges he has been depressed for over 10 years.  Mr. Yang reported he goes to a clinic and sees a doctor for depression and takes medication.  He said the medication helped initially, but no longer are helpful.  Ms. Chang testified also he has emotional problems and a memory problem.  The evidence of record reveals the claimant has a long history of mental health treatment for posttraumatic stress disorder and depression.  He has received a combination of group therapy and medication management services.  The consulting psychiatrist, Dr. Ekram Michiel, reported in May, 2003, that on the basis of the clinical examination and the claimant's history, he had the mental capacity to maintain adequate attention and concentration and to carry out one or two step simple job instructions, and could relate and interact appropriately with coworkers, supervisors, and the general public. . . .

. . . [A]lthough he said medications are no longer effective and he cannot sit for more than 2 hours total, and that forgetfulness and lack of concentration are a consistent event with him, I note for the record he engages in a wide range of activities of daily living.  His activities of daily living are full.  As alluded earlier, he went to Laos earlier this year for a month-long visit for a death in the family; however, his wife testified the trip was to buy herbal medicines for his ailments.  I also note he has a driver's license and drives.  Also showing diminished credibility, I note the claimant was taking methadone at the time of a hospitalization in January, 1997, likely secondary to a history of intravenous drug abuse.  Even though the claimant and his wife both testified as to chest pain, it is relevant in relation to his credibility that Mr. Yang denied <u>chest pain and extremity weakness</u>.  The claimant also has a poor work history.

I have also noted Third Party (daughter's) Statement indicating claimant experiences sleep disturbances, does not shop, prepare meals, or do any household chores, is forgetful, needs help with personal grooming, and is seclusive, etc., and given it some weight, but not controlling as those statements are not quantified, and the determination of ability to work is reserved to the Commissioner. Furthermore, the reported limitations are inconsistent with the claimant's level of activities (traveled to Laos in early 2006).

Accordingly, for all of the above and foregoing, the claimant's testimony and written statements are not credible to the effect he is totally precluded from all sustained work activity.

AR 22-24, internal citations omitted.

ALJ Berry provided numerous reasons for finding Plaintiff's credibility to be poor.  He

specifically referred to medical diagnostic findings that revealed minimal or mild findings, and

the objective findings of the consulting examiner.  The ALJ also noted that while Plaintiff

1    testified he could stand and walk for a total of no more than twenty or thirty minutes, and sit for

2    no more than a total of two hours, Plaintiff did acknowledge a trip from Fresno to Laos that he

3    required he sit for nearly an entire day on an airplane.  Further, while Plaintiff testified he is

4    unable to work due to depression, the consulting psychiatrist found he was capable of work

5    despite his depressive disorder.  The ALJ also noted Plaintiff has a driver's license and does

6    drive and may have a history of drug use affecting his credibility.  He also referenced a

7    discrepancy regarding Plaintiff's reported chest pain, as well as Plaintiff's poor work history.

8    These reasons relate to Plaintiff's reputation for truthfulness, prior inconsistent statements

9    concerning his symptoms, other testimony that appears less than candid, daily activities, work

10   record, and observations of treating and examining physicians.  *See Smolen*, 80 F.3d at 1284; *Orn*

11   *v. Astrue*, 495 F.3d at 638.

12          Even if the ALJ erred regarding Plaintiff's credibility as it relates to his travel to Laos, it

13   is not the only basis for the ALJ's credibility determination.  *See eg., Batson v. Barnhart*, 359

14   F.3d 1190, 1197 (9th Cir. 2004) (upholding ALJ's credibility determination even though one

15   reason may have been in error).

16          **E.      *Compliance With Remand Order***

17          Next, Plaintiff asserts the ALJ erred by failing to comply with the remand order because

18   "he wrote an inflaming letter to the treating doctors, which quieted justice . . ."  He also failed to

19   develop the record by obtaining updated medical records or requesting updated consultative

20   examiner reports, leaving that "effort totally up to Plaintiff and counsel."  Plaintiff concludes that

21   these errors require remand.  (Doc. 22 at 21.)  Defendant replies the ALJ complied with the

22   remand order by recontacting Drs. Lubenko and Parayno by providing them with an opportunity

23   to clarify their opinions, that the ALJ sought the doctors' addresses from Plaintiff's counsel

24   because the claim file was void that information, that the letters were not offensive, inflammatory

25   or threatening, and that the remand order did not require an additional consultative examination.

26   (Doc. 26 at 16-18.)

27

28

The remand order provided as follows:

> The hearing tape has been certified as lost; therefore, the record is incomplete. In addition, the Administrative Law Judge rejected the opinions of Drs. Lubenko and Parayn[o] and gave reasons for doing so. However, recontact with these doctors is needed in order to clarify or clinically substantiate these opinions [citation].
>
> Accordingly, the Administrative Law Judge will obtain all available updated medical records from the claimant's treating sources, particularly supporting clinical evidence or clarification from his treating physicians, and give him an opportunity for a de novo hearing. The Administrative Law Judge will evaluate the medical opinions of the claimant's treating, examining, and reviewing physicians and state what weight is given to such opinions.
>
> In compliance with the above, the Administrative Law Judge will take any further action needed to complete the administrative record and issue a new decision.

AR 78-79.

The Court has reviewed the letters forwarded by the ALJ to Drs. Lubenko and Parayno. *See* AR 158-159. The letters are in no way offensive, inflammatory or threatening. They contain proper emphasis regarding the information sought and the need for verification. Moreover, with regard to Plaintiff's assertion that the ALJ "did nothing to develop the record," the assertion is belied by the record.

Plaintiff's complaint on this basis lacks merit.

### F.   *Duty to Recontact Dr. Michiel*

Finally, Plaintiff contends the ALJ erred by failing to fully and fairly develop the record when he failed to recontact Dr. Michiel to obtain additional testing or an assessment of Plaintiff's mental limitations. (Doc. 22 at 22-23.) The Commissioner responds that the ALJ had no duty to further develop the record because the doctor's report was thorough and included a mental status examination, diagnosis and conclusion. (Doc. 26 at 18-19.)

It is Plaintiff's burden to produce full and complete medical records, not the Commissioner's. *Meanel v. Apfel,* 172 F.3d 1111, 1113 (9th Cir. 1999). However, when the evidence is ambiguous or "the record is inadequate" to allow for proper evaluation of the evidence, the ALJ has a duty to develop the record. *Tonapetyan v. Halter*, 242 F.3d at 1150. The ALJ may discharge this duty in one of several ways, including subpoenaing claimant's

doctors, submitting questions to claimant's physicians, continuing the hearing, or keeping the record open after the hearing to allow supplementation of the record. *Id.*

Here, the Court agrees with the Commissioner. Dr. Michiel's report is adequate and allows for a proper evaluation of the evidence. The doctor's report includes his general observations, Plaintiff's chief complaint, a history of the illness provided by Plaintiff, a list of current medications, and a family/social/environmental history. Further, the report includes a mental status examination that covered attitude and behavior, intellectual functioning, abstract thinking, insight and judgment, as well as affect and reality content consideration. Dr. Michiel diagnosed depressive disorder not otherwise specified with a GAF between 55 and 60. The doctor concluded Plaintiff could maintain attention and concentration and perform one to two step simple instruction type work. AR 286-289. Thus, Dr. Michiel's report allowed for a proper evaluation, and thus, the ALJ did not err in failing to recontact Dr. Michiel.

## CONCLUSION

Based on the foregoing, the Court finds that the ALJ's decision is supported by substantial evidence in the record as a whole and is based on proper legal standards. Accordingly, this Court DENIES Plaintiff's appeal from the administrative decision of the Commissioner of Social Security. The Clerk of this Court is DIRECTED to enter judgment in favor of Defendant Michael J. Astrue, Commissioner of Social Security and against Plaintiff, Seng Yang.


     IT IS SO ORDERED.

**Dated:    February 4, 2010**              **/s/ Gary S. Austin**
                                        UNITED STATES MAGISTRATE JUDGE

27